

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00012-CV

_____


CHARLES M. CHAMBERS AND JULIANN S. CHAMBERS, Appellants

V.

EQUITY BANK, SSB, Appellee



On Appeal from the 402nd Judicial District Court
Wood County, Texas
Trial Court No. 2005-373



Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

OPINION

Unknown to Charles M. Chambers, when he passed by the Lighthouse Resort on Lake Fork on a weekend fishing trip in early 2004 and noticed the "for sale" sign, was the fact that lurking beneath the resort's surface was a damaged or defective septic system. It is not disputed that, in April 2004, when Charles M. and Juliann S. Chambers (herein Chambers) executed a contract to buy the resort from Franklin National Bank (now Equity Bank, SSB),[1] Chambers did not know either that there were problems with the septic system or that the Bank knew of those problems. Disputed issues at trial and on appeal involve when Chambers learned of the septic system problems and of the Bank's knowledge of those problems,[2] whether Chambers proceeded with the purchase of the resort[3] with such knowledge, and what effect those developments have on Chambers' fraud claim against the Bank arising from the sale.

The sequence of events is helpful to an understanding of the issues.

A "pre-closing" of the Lighthouse property took place June 28, 2004, at which time various, but not all, closing documents were signed; none were filed for record at that time. At

---

[1]Chambers agreed to purchase the property from the Bank for $685,000.00.

[2]Chambers would later learn that, even though David Coe, senior vice president of Franklin National Bank (Bank) knew that sewage was being pumped from the septic holding tank at the hotel, he never informed Chambers of this fact. Coe was advised by the former owner of the Lighthouse that the subcontractor who installed the septic system failed to install the pump and the connecting line from the tank at the motel to the system behind the convenience store.

[3]The resort consisted of a convenience store with gas pumps, a restaurant, and a motel. The resort was built on Lake Fork in 2002 by Sharon Hale and her husband. After the untimely death of her husband, Hale was unable to run the business and provided the mortgage holder, Franklin National Bank, with a deed in lieu of foreclosure. Thus, the Bank had the resort in its inventory for a period approaching two years.

that time, Chambers signed a promissory note for $650,000.00, the Bank gave Chambers the keys to the Lighthouse property along with $15,000.00 for operating expenses, and Chambers began cleaning up the property. Chambers did not pay any part of the sales price on June 28 and admits that the property was not purchased on that date.

On June 29, 2004, Chambers was advised by the Sabine River Authority of the problem with the septic system.

As a result, Chambers and the Bank entered into an amended contract July 20, 2004, which provided that the Bank was to repair the septic system for an allowance not to exceed $32,000.00.[4] While many of the closing documents had been signed by Chambers June 28, 2004, the warranty deed conveying the real estate and the bill of sale conveying title to the personal property were not signed by the Bank until July 20, 2004, the deed of trust was not recorded until July 22, 2004, and no monies were paid by Chambers or disbursed by the Bank from the SBA loan until the contract amendment was signed.

Before the septic-system repairs could be made, Chambers filed for bankruptcy and stopped making payments on the note to the Bank.

---

[4]The amended contract provides, "[I]n addition to any repairs and treatments otherwise required by the contract, Seller, at Seller's expense, shall complete the following repairs and treatments: [I]nstallation of system for waste water disposal for an allowance not to exceed $32,000.00."

The Bank foreclosed on the property and sued Chambers for the remaining deficiency on the loan. Chambers thereafter filed suit against the Bank for fraud and real estate fraud. The two cases were consolidated and tried to a jury.

The jury found in favor of Chambers on the fraud claims and assessed damages, exemplary damages, and attorney's fees. Damages were awarded in the amount of $68,583.73, representing the net consideration paid by Chambers to the Bank; $36,840.00 in attorney's fees, costs of septic pumping, and value of inventory lost due to foreclosure; and $175,000.00 in exemplary damages. In addition, the jury answered question number eight on ratification in favor of the Bank, finding that Chambers ratified the fraud. On the Bank's motion, the trial court entered judgment in favor of the Bank in the amount of its deficiency claim of $219,415.17.

Chambers appeals. We affirm the judgment of the trial court because (1) Chambers waived any claim of defect in the instruction given to the jury on ratification, (2) the evidence is legally and factually sufficient to support the jury's finding of ratification, and (3) the trial court correctly disregarded the jury's answers to all questions except question number eight.

*(1)      Chambers Waived any Claim of Defect in the Instruction on Ratification*

In connection with a question submitting the Bank's ratification defense, the jury was instructed that ratification occurs when one affirms an existing contract or enters a new one after becoming "aware of the fraud." Specifically, the jury was instructed:

In answering this question,[5] you are instructed that ratification occurs if a defrauded party enters into a new agreement or otherwise affirms the contract and recognizes the contract as subsisting after becoming aware of the fraud.

At the charge conference, counsel for Chambers made the following objection to this question and instruction:

Plaintiffs object to Question No. 8 on the basis that there is no evidence to support the submission of such an issue to the jury, or in the alternative, the evidence is insufficient as a matter of law to support the submission of this issue to the jury, and a yes answer to that question would not be supported by sufficient evidence. We're also objecting to that on the basis that there is no authority cited for the contents of the ratification instruction that accompanies that issue.

The Bank contends Chambers' complaint of charge error—that the instruction is a misstatement of Texas law—has been waived. As a threshold issue, we examine whether Chambers waived this complaint. Our procedural rules state that any complaint to a jury charge is waived unless specifically included in an objection.

A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading is waived unless specifically included in the objections.

TEX. R. CIV. P. 274.

To preserve error in a defective instruction, the complaining party must specifically object, clearly identify the error, and explain the grounds for the objection. *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003); *Spencer v. Eagle Star Ins. Co.*, 876 S.W.2d 154, 157 (Tex. 1994). The offending language must be identified with sufficient precision to apprise the trial court of just

---

[5]Question No. 8 reads: "Was the contract in question 'ratified' by Michael and Juliann Chambers?"

5

what makes the submission erroneous and of what corrective action might be taken. *B.L.D.*, 113 S.W.3d at 349–50. Further, the grounds supporting an objection made during trial must conform to the argument supporting the corresponding point of error on appeal. *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 655 (Tex. App.—Corpus Christi 1991, writ denied). Accordingly, an objection made during trial which is different from the argument urged on appeal presents nothing for appellate review. *Borden, Inc. v. Guerra*, 860 S.W.2d 515, 525 (Tex. App.—Corpus Christi 1993, writ dism'd by agr.).

To complain on appeal that the instruction misstates the law, Chambers must have made such an objection at trial, specifically pointing out the objectionable matter and the grounds for the objection. *See Bryant v. Transcontinental Gas Pipe Line Corp.*, 821 S.W.2d 187, 189 (Tex. App.—Houston [14th Dist.] 1991, writ denied). Aside from a legal sufficiency complaint, Chambers' sole complaint at trial regarding the instruction on ratification was: "there is no authority cited for the contents of the ratification instruction that accompanies that issue." This objection fails to challenge the text of the instruction and does not identify anything about the instruction that might be suspect; there is no claim that the instruction is improper. The objection here does not communicate to the trial court the claim that the proposed instruction is a misstatement of Texas law, as is alleged on appeal. Chambers' complaint on appeal is precisely targeted and asserts that the instruction's use of the phrase "became aware of the fraud," rather than "full knowledge of the fraud and all material facts" is a misstatement of Texas law. No such

argument was made to the trial court.

"Important prudential considerations underscore our rules on preservation. Requiring parties to raise complaints at trial conserves judicial resources by giving trial courts an opportunity to correct an error before an appeal proceeds." *B.L.D.*, 113 S.W.3d at 350. Because Chambers' objection to the trial court did not state, or even imply, that the ratification instruction misstates the law, no error on this issue was preserved for our review. We do not address whether the instruction on ratification was a misstatement of Texas law. We overrule this point of error.

*(2)*          *The Evidence Is Legally and Factually Sufficient to Support the Jury's Finding of Ratification*

Ratification is an affirmative defense that the defendant must prove. *Lesikar v. Rappeport*, 33 S.W.3d 282, 300 (Tex. App.—Texarkana 2000, pet. denied). Because Chambers did not have the burden of proof on this issue and is challenging the legal sufficiency of the jury's finding, we consider all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex. 1998). We are to consider the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001). If there is more than a scintilla of evidence to support the finding, we must uphold it. *Associated Indem. Corp.*, 964 S.W.2d at 285–86. "More than a scintilla of evidence exists if the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Ford Motor Co. v.*

7

*Ridgeway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).   Conversely, evidence is no more than a scintilla when it is so weak that it amounts to nothing more than mere surmise.   *Id.*

When considering a factual sufficiency challenge to a jury's finding, we must consider and weigh all the evidence, not just that evidence which supports the verdict.   *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998).   We will set aside a verdict only when it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust.   *Id.*; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Lesikar*, 33 S.W.3d at 300.

The fraud found by the jury concerns the Bank's failure to inform Chambers about the condition of the septic system.   The question here is whether there is sufficient evidence that Chambers ratified that fraud.   The court's instruction to the jury in Question No. 8 was:

> In answering this question, you are instructed that ratification occurs if a defrauded party enters into a new agreement or otherwise affirms the contract and recognizes it as subsisting after becoming aware of the fraud.
>
> Answer "Yes" or "No"
>
> ANSWER:   Yes

Ratification occurs when the parties' obligations are adjusted after the defrauded party learns of the fraud.   *Wise v. Pena*, 552 S.W.2d 196, 199 (Tex. Civ. App.—Corpus Christi 1977, writ dism'd).   An agreement is also ratified if a party, by word or conduct, affirms the agreement after becoming aware of any fraud that would otherwise impair the agreement.   *Formosa Plastics*

8

*Corp., USA v. Kajima Int'l, Inc*., 216 S.W.3d 436, 456 (Tex. App.—Corpus Christi 2006, pet. denied). That is, ratification occurs whenever the parties act in a way that recognizes, in spite of the revealed fraud, the existence of a binding contract. *Id.* at 456.

In this case, the evidence shows that, after Chambers learned of the fraud, the purchase of the property was completed,[6] including the signing of an amended contract of sale expressly addressing the matter at the heart of the fraud allegation—repair of the septic system—at a cost to the Bank of $32,000.00. Chambers' testimony on this issue is as follows:

> Q. [By Mr. Young]: Did you have any verbal communication with anybody at the bank?
>
> A. I did. I told Paul Lester that this needed to get fixed or I wasn't going to give him my $100,000 down payment when I had it.
>
> Q. Did anybody at the bank, starting on June the 28th of '04 or 29th of '04 when you found out about it - - and I think the next significant date is probably going to be July the 20th, when they had this meeting at the bank - - did anybody at the bank during that period of time ever admit to you that they knew that there was a problem with the septic system at the Lighthouse prior to your contract?
>
> A. Yes. Paul Lester told me personally, I'm sorry, we should have told you about that, we know about it, it's no big deal, there is a pipe missing and we're going to hook it up for you, no problem no cost to you whatsoever, and David knows about it, he's already got a contractor to do it.
>
> . . . .

---

[6]While, as Chambers points out, many of the closing documents had been signed June 28, no deed or bill of sale was signed until July 20. It is clear, therefore, that closing did not finally occur until July 20, the same date as the amendment, making that date the key date for any ratification to have occurred and by which any knowledge by Chambers must have been gained for ratification to have been effective.

Q.      [By Mr. Cothren]:  Now, when you were [sic] received this letter from Weldon Griffith, the person that you had go out and do the engineering study or come up with a bid on June 29th of 2004, did you provide a copy of that quote, if you will, from Weldon Griffith saying it's going to cost somewhere from 35, 39,000 to 52,000?

A.      Did I provide a copy of that?

Q.      Yeah, to the bank.

A.      Yes, I did.

. . . .

Q.      [By Mr. Cothren]:   You actually went into the bank with a copy of that and told them, you're going to have to do something about this or I'm not coming up with the $100,000?

A.      I don't really recall that, but somehow or another I did tell them that, by the phone or in person, I don't recall.

Q.      Okay.  So when you had that report that was done for you, had knowledge about the septic problems and everything, you went into the bank with the report telling them that, we've got to work something out here or you're going to have to do something or I'm not coming up with the $100,000 at closing; isn't that correct?

A.      That's correct.

Q.      And at that point is when the negotiations began for the amendment of the contract which was signed June [sic] July 20th, 2004; is that correct?

A.      I guess.   I object to the word negotiate.   There were no negotiations.  They gave me a figure that they would fix it for that [sic] and that was that.

Q.      Well, did you tell them, that figure is not acceptable and I'm going to have go [sic] with Weldon Griffith's figure of 39,000 to 52,000?

10

A.    No.  They had Weldon Griffith's letter and they had told me that they had a contractor in my pocket, is the exact phrase that Paul Lester used, that Dave Coe has a contractor in his pocket that will do it for this amount of money.

. . . .

Q.    [By Mr. Cothren]:  You did agree to the contract amendment, sir, that says there will be an allowance of up to a maximum of $32,000; isn't that correct?

A.    That's what the contract says, yes.

Q.    And that's the contract you signed?

A.    I signed it.

. . . .

Q.    [By Mr. Cothren]:  So you knew when the contract amendment was signed, that if the cost of the septic system exceeded $32,000, that you would be responsible for payment of that excess; am I correct?

A.    Yes.

In spite of the foregoing testimony, Chambers claims there was no affirmation of the contract or recognition of the contract as subsisting after he became aware of the fraud.   This is so, he claims, because the closing papers were signed June 28, 2004, before he knew about the fraud, that the amendment was to get the Bank to fix the septic system, that he was told by the Bank that he could not back out of the deal, and that he had already been given a deed and keys to the property June 28, 2004.

Under the sales contract, Abstract Services, Inc., of Emory was to serve as escrow agent.

11

The contract provided that Chambers was to deposit $100,000.00 with the Bank as a condition of the sale. Apparently, both Chambers and the Bank wanted to sign the closing documents and allow Chambers to take possession of the property before Chambers was able to make the $100,000.00 deposit with the Bank. Chambers wanted to take possession prior to the July 4th weekend and the Bank, which was being sold, wanted the property listed as having already been sold before its sale took place.

While many of the closing documents were signed by Chambers June 28, 2004, the warranty deed was not signed by the Bank until July 20, 2004, the deed of trust was not recorded until July 22, 2004, the bill of sale conveying title to the personal property was not signed by the Bank until July 20, 2004, and no monies were paid by Chambers or disbursed by the Bank as disbursement on the SBA loan until the contract amendment was signed. Nothing in the record indicates that the deed to the property was delivered to Chambers June 28, 2004.[7]

Conveyance by deed requires delivery of the deed. TEX. PROP. CODE ANN. § 5.021 (Vernon 2004); *Noell v. Crow-Billingsley Air Park Ltd. P'ship*, 233 S.W.3d 408, 415 (Tex. App.—Dallas 2007, pet. denied). Delivery of a deed has two elements: (1) the grantor must place the deed within the control of the grantee (2) with the intention that the instrument become operative as a conveyance. *Noell*, 233 S.W.3d at 415. The question of delivery of the deed is controlled by the intent of the grantor, and it is determined by examining all the facts and

---

[7]The only evidence indicating Chambers ever wanted to "back out of the deal" was before the time he learned of any problems with the septic system. At that time, Chambers was informed that his earnest money would not be returned.

circumstances preceding, attending, and following the execution of the instrument. *Id.* Here, the deed was not placed in Chambers' control until July 20, 2004, when it was signed by the Bank. Even if Chambers took possession of the property June 28, there was no intention on the part of the Bank that the deed become an operative conveyance until July 20, 2004, when Chambers deposited $100,000.00 as a condition of the sale.

These events notwithstanding, we are nevertheless faced with the fact that Chambers, with knowledge of the full scope of the problems with the septic system, signed a contract amendment July 20, 2004, requiring the Bank to expend up to $32,000.00 to repair those problems.[8] Chambers claims that, even if the contract amendment somehow ratified the contract, the fraud found by the jury nevertheless vitiates the deficiency recovery under the note, because there is no finding of ratification that pertains to the note or any other document that was signed June 28, 2004. In the absence of arguments or citations to the record or relevant legal authority, this portion of Chambers' argument is inadequately briefed and will not be considered. *See* TEX. R. APP. P. 38.1(i); *LaCroix v. Simpson*, 148 S.W.3d 731, 735 (Tex. App.—Dallas 2004, no pet.).

Finally, Chambers contends that continued performance under a contract constitutes ratification only if the party has no continuing obligation to perform, citing *Fortune Prod. v. Conoco* , 52 S.W.3d 671, 679 (Tex. 2000). In that case, Conoco paid a premium to purchase the

---

[8]The jury was asked to determine whether the Bank promised to repair the septic system with the intention of not fulfilling that promise (thereby committing fraud). The jury found that the Bank did not commit fraud in making this promise.

13

Concho Valley Gas System, including gas purchase contracts. The contract price for residue gas exceeded the market price. Plaintiffs were producers of natural gas who were operating within the Concho Valley Gas System under existing gas processing contracts. When Conoco bought the plants and the contracts, it terminated the old gas purchase contracts and entered into new contracts with lower prices to the producers. The gas producers sued for fraud in the inducement on the new contracts. The court discussed the issue of whether the ratification of a contract induced by fraud precluded the right to sue for damages and recognized that, in some circumstances, a party induced to enter a contract by fraud may ratify the contract in such a manner that a claim for damages is foreclosed. *Id*. at 676–79. Those producers who continued to sell to Conoco without a written contract (after having learned of the fraud) were not entitled to sue for damages. Those producers who continued to sell to Conoco under a written contract were not precluded from bringing a suit for damages. *Id*. at 676.

This distinction rests on a requirement to fulfill the terms of a written contract. Those producers selling without written contracts delivered their gas and accepted payment. They were not required to sell, and Conoco was not required to purchase. Those producers who continued to sell to Conoco pursuant to written contracts with Conoco which were induced by fraud did not, as a matter of law, foreclose their right to sue for fraud damages. *Id.* at 679.

We see no application of the holding in *Fortune Production* to the facts presented here. In the present case, a written contract for sale was amended in a very precise manner designed to

14

address the fraud issue about which Chambers complained. This is a classic case of ratification whereby the obligations of the Bank and Chambers were adjusted after Chambers learned of the fraud. *See Wise*, 552 S.W.2d at 199. In entering into the amended contract with the Bank, Chambers acted in a way that recognized, in spite of the revealed fraud, the existence of a binding contract. *See Formosa Plastics Corp., USA*, 216 S.W.3d at 456. The evidence of ratification is both legally and factually sufficient to support the jury's finding of ratification.[9] We overrule this point of error.

*(3)      The Trial Court Correctly Disregarded the Jury's Answers to all Questions Except Question Number Eight*

The jury found in Chambers' favor on claims of fraud, damages that resulted from the fraud, and exemplary damages.[10] The jury also found, however, that Chambers ratified the contract. The Bank filed a post-trial motion for judgment on stipulated facts and in disregard of

_____

[9]While Chambers did not brief this argument on appeal, in oral argument before this Court Chambers contested ratification of the fraud because, while Charles was aware of the problem with the septic system at the time he signed the contract amendment, he was not aware that the Bank knew about the problem before the sale and failed to inform him of the problem. Consequently, Chambers claims not to be "aware of the fraud," and thus not to have ratified it. This argument is disproved by the record. At the July 20 meeting at the Bank, Paul Lester, senior vice president of the Bank, told Charles personally that he was sorry, "we should have told you about [the septic system], we know about it, it's no big deal, there is a pipe missing and we're going to hook it up for you, no problem, no cost to you whatsoever, and David knows about it, he's already got a contractor to do it."

[10]The jury answered "yes" to Questions 1 (fraud), 2 (real estate fraud), 4 (clear and convincing evidence that Chambers was harmed by the fraud), and 5 (actual awareness of the falsity of the representation or promise found to be real estate fraud). The jury returned damage findings in answer to Questions 6 (damages that resulted from the fraud), 7 (special damages proximately caused by the fraud), and 10 (exemplary damages). The damages found by the jury—consideration paid at the closing of the amended contract, attorney's fees incurred in the unsuccessful attempt to resist foreclosure, costs of septic pumping, and the value of foreclosed inventory—all pertain to items incurred at or after the closing of the amended contract. The Bank contends these items were not the result of fraud, but were a result of proper performance and foreclosure under the amended contract, which Chambers entered voluntarily after obtaining full knowledge of the facts and in exchange for the Bank's monetary concessions.

15

selected jury answers, in which it urged the trial court to disregard the jury's answers to Questions 1, 2, 4, 5, 6, 7, and 10. The trial court granted the motion.[11] The court's final judgment specifically states that the jury's answers to the referenced questions "should be and are disregarded," but does not state the basis for this finding. The court entered judgment in favor of the Bank "on the remaining jury answers"[12] and on the "stipulations of the parties."[13]

A trial court may disregard jury findings if they are unsupported by the evidence or if they are immaterial. *Green Int'l v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997); *Spencer*, 876 S.W.2d at 157. Because one of the bases set forth in the Bank's motion for judgment and in disregard of selected jury answers was the affirmative ratification finding, the trial court was permitted to disregard the jury findings if they were immaterial. *Spencer*, 876 S.W.2d at 157. A question is immaterial when it should not have been submitted, calls for a finding beyond the province of the jury, such as a question of law, or when it was properly submitted, but has been rendered immaterial by other findings. *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999). The Bank relies on the third ground. A trial court may disregard a jury's finding on an immaterial issue and render judgment based on the remaining findings; such a judgment is not considered as

---

[11]The Bank's motion to disregard selected jury answers was based on (1) the jury's finding of ratification, whereby Chambers abandoned any claims for rescission or damages and instead elected to accept the amended contract and (2) claims of no evidence to support each such answer.

[12]The remaining jury answers are to Question numbers 3 (no real estate fraud based upon an alternate definition of real estate fraud), 8 (finding Chambers ratified the contract), and 9 (Chambers did not waive claims of fraud against the Bank).

[13]The stipulations covered the amount of the deficiency owed to the Bank and the Bank's attorney's fees.

one rendered *non obstante veredicto*.  *Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 216 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).   If the questions disregarded by the trial court were immaterial, they were properly disregarded; otherwise, the trial court had no authority to disregard same and the error may be reversible.[14]   *Kuehnhoefer v. Welch*, 893 S.W.2d 689, 692 (Tex. App.—Texarkana 1995, writ denied).

The Bank relies on the jury's positive finding of ratification as the basis for its claim that the jury questions disregarded by the trial court were immaterial.   When a party ratifies an agreement that has been induced by fraud, the ratification generally vitiates the fraud, precluding rescission or recovery of fraud damages.   *See, e.g., Teders v. Mercantile Nat'l Bank*, 235 S.W.2d 485, 488 (Tex. Civ. App.—Dallas 1950, writ ref'd n.r.e.).   Once a contract has been ratified by a defrauded party, or a new agreement adjusting the original fraudulent acts has been consummated, the defrauded party waives any right of rescission or damages.   *Wise*, 552 S.W.2d at 200; *see also Meyer v. Cathey*, 167 S.W.3d 327 (Tex. 2005) (finding evidence of ratification of fraud legally sufficient and rendering judgment that party who ratified fraud take nothing on fraud claims). Here, the evidence of ratification is legally and factually sufficient.   Chambers' ratification of the contract has the legal effect of precluding recovery of fraud damages.[15]

---

[14]This statement assumes that all disregarded answers were otherwise supported by sufficient evidence.

[15]Chambers' contention of trial court error in disregarding the jury's answers responds only to that portion of the Bank's motion to disregard the jury's answers based on the assertion that there is insufficient evidence to support those findings.   Because we find the questions disregarded by the trial court were rendered immaterial by the jury's finding on ratification, we do not address the sufficiency of the evidence in support of the jury's answers to those questions.

17

While the jury determined the Bank committed fraud and real estate fraud against Chambers and assessed damages and exemplary damages for that fraud, Chambers ratified the fraud by entering into an amended contract that specifically addressed the matter at the heart of the fraud—the faulty septic system at the Lighthouse Resort. Chambers' ratification of the fraud precludes being awarded damages for that same fraud. Thus, the trial court correctly disregarded the jury's fraud and damage findings. This point of error is overruled.

We affirm the judgment of the trial court.


Josh R. Morriss, III
Chief Justice

Date Submitted:     June 30, 2010
Date Decided:       July 29, 2010

18