**AFFIRMED as MODIFIED and Opinion Filed September 17, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00799-CV

### JONATHAN CORNWELL AND SHADD MCKINNEY, Appellant
### V.
### DIANA SCOTHORN, STEWART SCOTHORN, THE BENEFIT LINK, INC., AND SCOTHORN AERO, INC., Appellee

**On Appeal from the 429th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 429-05287-2016**

## MEMORANDUM OPINION

Before Chief Justice Burns, Justice Molberg, and Justice Partida-Kipness
Opinion by Chief Justice Burns[1]

Jonathan Cornwell and Shadd McKinney appeal the trial court's judgment

awarding Diana and Stewart Scothorn $183,890.18 on their claim of promissory

estoppel against Cornwell and McKinney and awarding McKinney $17,427.86 for

credit card expenses and loss of credit reputation. In nine issues, Cornwell and

McKinney argue the trial court erred "by including the jury's promissory estoppel

---

[1] The Honorable David Bridges, Justice, participated in the submission of this appeal; however, he did not participate in the issuance of this opinion due to his death on July 25, 2020. Chief Justice Burns has reviewed the record and the briefs in this cause.

finding and associated damages" against them; the evidence does not support the jury's answers to the question regarding promissory estoppel, the question regarding the Scothorn's estoppel defense, and the question regarding Cornwell and McKinney's fraud; the trial court erred in not awarding Cornwell and McKinney equitable relief and awarding the Scothorns costs; the evidence conclusively established the jury's award of damages was excessive; and the trial court erred in denying Cornwell and McKinney's motion for new trial. As modified, we affirm the trial court's judgment.

In December 2016, the Scothorns filed suit against Cornwell and McKinney. The facts as set forth in the Scothorns' fourth amended petition are as follows. Legacy Aeronautics is a closely-held corporation, and Diana is the majority shareholder. Diana is also the sole shareholder of The Benefit Link, Inc., a Medicare supplement insurance company. In April 2015, the Scothorns were introduced to Cornwell and McKinney at church. Cornwell and McKinney had left positions in the aeronautics industry and were seeking investors to start Legacy. In discussions with the Scothorns, Cornwell and McKinney identified customers and contracts they had or were reasonably certain to have. The Scothorns agreed to provide the initial capital, which was all that was supposed to be required to fund initial operations, and no extended or continuing contributions were contemplated.

In August 2016, the parties signed a written agreement that confirmed Diana owned eighty percent of Legacy, and Cornwell and McKinney each owned ten

percent. The agreement was made retroactive back to the inception of Legacy in April 2015. At all times, Cornwell and McKinney ran Legacy's daily operations.

Despite the Scothorns' initial understanding that they would only make the initial equity contribution, Cornwell and McKinney continued to request additional funds. Cornwell and McKinney indicated that there were substantial deals in place or in Legacy's pipeline that required additional funds to be fulfilled. Between April 2015 and October 2016, the Scothorns advanced approximately $2.35 million to Cornwell and McKinney directly or indirectly through direct payments or purchases made on behalf of Cornwell and McKinney and Legacy. Of this amount, $1.7 million went to Cornwell and McKinney and/or Legacy, $37,700 was spent on equipment purchases by Legacy, and $626,000 was used to pay for Legacy's staffing.

By October 2016, the Scothorns became weary of Cornwell and McKinney's repeated requests for additional advances. Following Cornwell and McKinney's representations that they were working twenty-four hours a day and not getting paid, the Scothorns offered the help of a Benefit Link employee, Micah Lynch, who requested financial information to create a budget and provide operational structures and support. By late October or early November, operations had not improved and Cornwell and McKinney were requesting additional funds. By that time, Lynch had determined Legacy had accounts payable of a million dollars and was unable to fund

its operations. Lynch also had a difficult time getting complete information from Cornwell and McKinney.

The Scothorns discovered that, although Legacy was not profitable and at times insolvent, Cornwell and McKinney collectively paid themselves direct compensation in excess of $240,000 during the partial year 2015 and more than $300,000 during 2016. Cornwell and McKinney did not account for the payments as wages or distributions; instead, when Legacy received funds, Cornwell and McKinney dispersed the funds to themselves. At the same time, Cornwell and McKinney did not make any distributions to the Scothorns, Legacy was incurring additional debt to third-party vendors for contract labor, and Cornwell and McKinney were charging personal expenses to Legacy. In November 2016, the Scothorns requested documentation of Legacy's expenses, but Cornwell and McKinney failed to provide support for the expenses or documentation as to the necessity of the expenses as they related to Legacy's business. On November 14, 2016, Cornwell and McKinney indicated they would not continue to run Legacy without additional cash from the Scothorns. On November 17, 2016, Cornwell and McKinney notified the Scothorns that (1) they had "secured" the leased space rented by Legacy, (2) they would seek other employment, (3) the company credit card was past due and could not be paid, (4) all equipment owned by Legacy was located in the leased space, and (5) approximately $60,000 in accounts receivable remained to be collected by Legacy for work already completed. Based on the foregoing, the

Scothorns filed suit alleging causes of action for breach of fiduciary duty/constructive fraud, fraud/fraudulent inducement, money had and received, alter ego, conversion, conspiracy, breach of contract, and promissory estoppel. The Scothorns also requested the appointment of a receiver.

Cornwell and McKinney filed an answer denying that all conditions precedent had occurred and asserting the following affirmative defenses: duress, lack of consideration, fraud, ratification, waiver, and estoppel or quasi-estoppel. Cornwell and McKinney also asserted that the Scothorn's claims were barred by the business judgment rule and the Scothorns' damages were caused by themselves or others.

Cornwell and McKinney also filed counterclaims and third-party claims and asserted the following version of the facts. Cornwell and McKinney formed Legacy in April 2015 and granted Stewart a twenty-percent interest in exchange for start-up capital on an as-needed basis. At all times, Cornwell and McKinney made it clear that they lacked capital, the business was not likely to attain profitability for some time, and they would need additional funds to conduct operations while the business developed. Cornwell and McKinney were to receive a salary for conducting Legacy's operations and, as funds were needed, they were to inform Stewart, and Stewart would advance the funds. At that time, Stewart did not disclose or mention that his wife, Diana, was involved in Legacy's business or that she was providing the funds to meet Legacy's operating requirements. Instead, Cornwell and McKinney were led to believe they were dealing with Stewart as their fellow

shareholder. In July 2015, Stewart made advances of $189,420.12 and $150,000. In August 2015, after only a few months of operations and despite being told at the outset that additional funds would be needed to fund Legacy's operations until it became profitable, Stewart expressed frustration about the funds needed to operate Legacy. Stewart made it clear that, unless he was given a higher percentage of ownership, he would refuse to provide further financial support to Legacy. Cornwell and McKinney offered to change the ownership structure to make Stewart a sixty percent owner, and Stewart continued to fund Legacy as needed.

Stewart served as corporate officer in charge of the finances for Legacy, while Cornwell and McKinney conducted day-to-day operations. Cornwell and McKinney discussed financial expenditures with Stewart, and Stewart cleared the expenditures before payments were made. In this role, Stewart made further advances to Legacy as follows: $86,000 on December 3, 2015; $85,000 on December 18, 2015; $100,000 on March 12, 2016; $100,000 on March 24, 2016; $100,000 on April 10, 2016; and $75,000 on April 20, 2016. During this time period, Cornwell and McKinney provided Stewart with details on the amounts Legacy was paying and, in his capacity as chief financial officer, Stewart approved the expenditures.

During this same time period, Cornwell and McKinney continued to develop Legacy's business and pursue new clients. Cornwell and McKinney developed a business strategy to pursue government contracts through a federal small business

set-aside program. On August 17, 2016, Cornwell and McKinney discussed with Stewart the opportunity to serve as the prime contractor on a federal contract with Bell Helicopter serving as the sub-contractor. Cornwell and McKinney discussed similar opportunities with Bell Helicopter, Raytheon, and Lockheed Martin, and they kept Stewart informed about these opportunities.

In April 2016, Stewart required five percent of all revenue generated be paid to his charitable foundation. Stewart also required that $100,000 per month be repaid to Stewart as "ruminative compensation for Capital initially invested." If not paid, this "ruminative compensation" was to "earn interest of 50% per month" and "accumulate and compound" until paid. Stewart also told Cornwell and McKinney they could recover some of the percentages taken from them by meeting certain weight loss demands.

In August 2016, Cornwell and McKinney discussed with Stewart transferring his ownership to his wife, Diana. Stewart remained a corporate officer of Legacy, and Cornwell and McKinney continued to deal with Stewart, not Diana. Nevertheless, on September 19, 2016, The Benefit Link sent documents to the Texas Secretary of State purporting to name Diana as the sole shareholder of Legacy, which she never was. At no time did Cornwell or McKinney receive any consideration for any part of their original forty percent ownership interest in Legacy.

Although Cornwell and McKinney's relationship with Stewart continued to deteriorate, Cornwell and McKinney continued to do their jobs and generate revenue

–7–

through purchase orders and sales contracts. Cornwell and McKinney further pursued promising prospective business relations with Bell Helicopter, Lockheed Martin, and others for government small business set-aside contracts

However, as early as October 2016, the Scothorns began discussions with their attorney concerning Legacy and directed Micah Lynch, as an employee of The Benefit Link, to review Legacy's finances. The Scothorns also suggested Marcus Young, another employee of The Benefit Link, for a position at Legacy. Cornwell and McKinney cooperated with these efforts and were given no indication that the Scothorns were planning to end their involvement and support of Legacy.

At a November 4, 2016 meeting, Stewart demanded that Cornwell and McKinney sign a stock agreement and promissory note that would obligate Cornwell and McKinney to pay $3,500,000 each to the Scothorns. This amount exceeded anything the Scothorns advanced to Legacy, and Cornwell and McKinney had never agreed to be personally liable for funds contributed, loaned, or advanced to Legacy. When Cornwell and McKinney refused to sign, the Scothorns proceeded with their plans to shut down Legacy.

On November 6, 2016, at the direction of the Scothorns, Lynch made demand for all documents related to Legacy's business operations, including vendor information, customer information, log-in and password information, accounts payable, existing lease agreements, and purchase orders. Two days later, Stewart emptied Legacy's bank accounts, effectively suspending Legacy's operations.

Cornwell and McKinney came to believe the Scothorns had decided to shut down Legacy and form a new competing company, Scothorn Aero, Inc. (SAI). On November 22, 2016, Diana filed papers with the Texas Secretary of State forming SAI. Prior to that, SAI developed a website and a business plan using third-party vendors. Young, who received training and information regarding Legacy's business, became SAI's executive director. SAI is wholly owned by Stewart and Diana, and both they and Lynch serve as officers of SAI. Based on these facts, Cornwell and McKinney asserted claims of breach of fiduciary duty/knowing participation, fraud, tortious interference with existing and prospective business relations, aiding and abetting/civil conspiracy/ratification, respondeat superior/vice principal, and attorney's fees.

At a jury trial in April 2018, Stewart testified he met McKinney at a time when he was the chief executive officer of The Benefit Link and Diana was the owner. McKinney said he wanted to tell Stewart about getting into business making cabinets and galleys for commercial and private jets. McKinney said Cornwell was his friend and was extremely experienced within the industry and had twenty-five years of experience. Stewart met with Cornwell and McKinney, and they told Stewart they had existing clients from their company that was going out of business. Cornwell and McKinney said they had "in the neighborhood of $10 million in contracts that they wanted to get," and they just needed more space and more equipment to get the contracts. They asked Stewart to invest, but he said he was not interested.

McKinney was "very persistent," so Stewart said he would "pray about it" and ask his wife about it.

At a subsequent meeting, Cornwell and McKinney discussed with Stewart orders or business "in the tens of millions" and a profit margin of thirty percent. They discussed "Two and a half million dollars in revenue with $750,000 in profit for the first year." At another meeting, Cornwell and McKinney said they could start the business with $180,000 to get the necessary equipment and secure the space. Once they got new business, there would be a down payment on the work, "so you have cash flow that automatically comes in." Regarding ownership, Stewart was to receive a twenty-percent interest for "that one $180,000." Stewart gave Cornwell and McKinney each a check for $15,000 in return for twenty-percent ownership and a return based on the "$750,000 in profit the first year, two and a half million dollars in sales." Stewart also gave Cornwell a $150,000 check to secure premises for the business and buy equipment. Stewart testified they "never talked about them having any kind of huge salary because there was no way that you could ever do the numbers to justify that." Specifically, Stewart testified he did not agree that Cornwell and McKinney could each be paid $180,000 per year, and he did not agree on a specific amount for Cornwell's and McKinney's salaries.

As part of the investment, Cornwell and McKinney provided Stewart a Branding Plan that memorialized in writing "some of the most significant things that we both agreed on and thought this would be important." The Plan discussed filling

a "void in the current VIP aviation marketplace" for cabinetry and galleys by "starting our business debt-free and having long-term reoccurring business." The Plan contained a "three-year financial projection sales of two and a half million, net profit $750,000." The Plan stated, "we can meet our competitors [sic] prices if we want to because we will have less overhead and no debt."

In August 2015, Stewart agreed to fund money for projects that were delayed and for equipment, and he told Cornwell and McKinney they would have to increase the percentage of interest that he and Diana had. In an email, Cornwell and McKinney agreed to give Stewart and Diana a sixty percent interest and take a twenty percent interest each. Stewart testified this agreement was not formalized. According to what Cornwell and McKinney were telling Stewart, in August 2015 "Everything from a profit margin and from the revenue side was going as expected."

Stewart testified that, in December 2015, TBL Staffing was started at the request of Cornwell and McKinney and was funded by The Benefit Link. Stewart testified the idea was to "create a profit center" by providing staffing to Legacy that Legacy would have to pay for anyway. For "maybe the first few weeks," Legacy paid for the staffing provided by TBL Staffing, but "after that, they didn't pay anymore." McKinney came to Stewart and said he had "a payment that's missing again" and asked Stewart to "bail us out." Stewart "agreed to put more money in" and put in $85,000. About two weeks later, McKinney needed money to bid a new

project. Stewart agreed to advance more money but told Cornwell and McKinney they would "have to revisit the equity structure again."

Over the next few months, Cornwell and McKinney did not pay TBL Staffing and, by April 2016, Legacy owed TBL Staffing "about $625,000." Stewart was "really upset" and "wrote a very terse letter" to Cornwell and McKinney telling them to "please go ahead and straighten up." Cornwell and McKinney told Stewart they were "going to get some kind of payment plan worked out by TBL," and Stewart was "comfortable going forward." Stewart also told Cornwell and McKinney he "needed to see all the checks or any withdrawals out of the account and any deposits coming in, because [he] had virtually no clue what was going on." In response, Stewart received emails containing "some" of the information, but he "did not receive all of the expenses." For a couple of months, the emails continued but Cornwell and McKinney then told Stewart "they got a little too busy to be able to do this anymore." TBL Staffing was shut down and, at that time, Legacy owed TBL Staffing $625,747. Stewart testified this amount came from The Benefit Link and Diana and Stewart.

Throughout 2016, Stewart met with Cornwell and McKinney once or twice a month, and Cornwell "would put up a spreadsheet" on cash flow, projects in progress, and costs. However, "there were no documents that were given." Regarding profit margins, Stewart still understood "what they told me, which was everything was 30 percent." In August 2016, McKinney had gone to a "women-

–12–

owned, small business administration conference" and met somebody from Bell Helicopter and learned of "a set-aside contract for women-owned or, at least, for small business." Cornwell and McKinney asked Stewart to "switch over all the ownership directly into Diana's name" and "kind of change the entire partnership to reflect that to get a signed agreement." Cornwell sent Stewart a text on August 16 saying that the solicitation on the Bell Helicopter contract was due on August 17 or 18 and asking Stewart to "get these documents done." On August 17, 2016, the parties signed an agreement "reflecting that Diana was now 80 percent shareholder," Stewart was "zero," and Cornwell and McKinney "were 10 percent each."

At this same time, Cornwell and McKinney again asked for more money "to clean up some of the other projects that they had" before "gear[ing] up for the government contracting part." Stewart agreed to give Cornwell and McKinney more money. Later in August, "because this was a done deal, according to [McKinney], the $111 million contract, [Cornwell and McKinney] had asked if they could earn back an additional 10 percent." Stewart testified he and Diana were "ecstatic knowing that we could have something that could actually give us return on money we invested now for a considerable amount of time and not received anything." Stewart knew that both Cornwell and McKinney wanted to lose weight, so Stewart said to them, "what if we just say in January, if you guys have lost this weight, you guys can get your additional 10 percent." The weight loss agreement was made a part of a signed agreement.

By October 2016, Cornwell and McKinney were "bidding on Department of Defense stuff" and "got really, really busy," so Stewart asked Lynch to "come in and take a look and help." Lynch "had a background in really turning things around," and Lynch was able to run some advertisements and "get some candidates in to send over to Legacy" to help. One of the candidates was Young. As Lynch worked on a budget with Cornwell, Cornwell provided Lynch with spreadsheets that Stewart "was familiar with seeing." However, these spreadsheets, for the first time, showed Cornwell's and McKinney's salaries. Lynch "couldn't make any sense of the numbers when she was looking at it." At one time, "the accounts payable would be $30,000," and the "next time it was $300,000," then "it worked its way up to 900-and-some-odd thousand, and finally a million-one."

Also in October, Stewart advanced Cornwell and McKinney another $70,000 "for labor and materials on a job that they were getting." As part of making Legacy a woman-owned business, McKinney went to the bank to add Diana and Stewart as signatories on Legacy's checking account. Prior to October 2016, Stewart did not have access to the checking account. Stewart accessed Legacy's bank account and found "a number of charges that were questionable."

Stewart testified he and Diana invested a total of $1,793,102 in Legacy. Stewart did not know about "the $15,000 each [Cornwell and McKinney] took out a month" and only learned of the payments in discovery. Stewart also learned Cornwell and McKinney had a debit card that "they were charging all kinds of

–14–

things" on, including "Pediatric dentists, $2,000 Kroger bills, $2,000 hotel bills, $800 dinners, all sorts of personal things."

In late October 2016, McKinney called Stewart to tell him the Bell Helicopter deal was not going to happen. At a subsequent meeting, Stewart presented Cornwell and McKinney with a promissory note after working with his attorney to "draft something up trying to figure out if [Cornwell and McKinney] would be accountable." Stewart testified that, even though the amount of the promissory note was $3.5 million, "it was really just a negotiating point." Stewart arrived at the $3.5 million figure by adding together the "million and a half" the Scothorns had invested and the approximately $2 million Legacy had "in terms of revenue." Cornwell and McKinney said they would get an attorney to look at the promissory note, and Stewart agreed. After going to see an attorney, Cornwell and McKinney "came back and said we are not going to sign any note in any way." Stewart told Cornwell and McKinney there had to be "some document" showing they "were involved in this process," and it had to be a promissory note. Stewart said he did not care what the amount of the note was, and he told Cornwell and McKinney to "go ahead and figure that out." Stewart testified he never reached an agreement with Cornwell and McKinney.

When asked if he owed a fiduciary duty to Legacy, Stewart testified that, from August 17, 2016 when he signed a document making him chief financial officer of Legacy until November 22 when he resigned, "the title of chief financial officer

–15–

owed a fiduciary duty, but I did not have any of the documents or the ability to operate in that position given the information that I had." When asked what he was asserting in the lawsuit that Cornwell and McKinney did wrong, Stewart responded:

> They did not–they had a fiduciary duty to the company and to its shareholders, and they breached that in many ways by not operating the company in its best interest. They were definitely working on their own self interest, making sure that they got paid. If you wanted to walk through each one of the statements and look, you can notice, you know, there were other things that obviously didn't get paid if you had a million dollars in payables, but you did pay yourself. And none of that makes sense when you're a president and CEO of a accompany. You have an obligation to make sure that the company is operating at its best, and let the shareholder know what's going on. I had no clue what was going on until we got [Lynch] involved. That was never any information that was given to me. That's something that should be on the forefront at all points in time. But I also would never have invested the first dime had I known this was the kind of integrity.
>
> Now, I mean, I don't think that I had any of that information. It's kind of like I didn't know what I didn't know, but I do know what I know now. And I believed what they told me before. I believed everything that they said was true. It all made sense to me. They just continued to induce us to go ahead and put more money in, based on what they told us was happening in the business, and, in fact, that was not the case.

Stewart testified he and Diana sought to recover $1,793,102.

On cross-examination, Stewart agreed the document he signed made him chief financial officer retroactively from the inception of the company. Stewart admitted he received an email on August 17, 2016, from the accountant for Legacy and The Benefit Link containing a correction to form 1125-E that was being provided to the IRS. The form was titled "Compensation of Officers" and showed Cornwell was paid $120,000 and McKinney was paid $119,000. Stewart testified he "never saw

this document." Stewart testified that, "if [Cornwell and McKinney] requested pay, they got paid."

Allyn Needham, an economic consultant, performed a lost profits analysis on Legacy. Relying on a projection of five years' worth of future sales for Legacy provided by McKinney, Needham testified Legacy lost between $7 million and $9 million in profits over a five-year period from 2017 to 2021. Needham testified that Legacy never made any profit, and Legacy did not have any money to keep operating unless the Scothorns or someone put money in. In response to questioning, Needham agreed that the Scothorns never got a return on their investment in Legacy.

The jury found the Scothorns substantially relied to their detriment on promise(s) made by Cornwell and McKinney, this reliance was foreseeable by Cornwell and McKinney, and the Scothorns were entitled to damages of $201,318.04. The jury also found Stewart did not comply with his fiduciary duties owed to legacy while he was chief financial officer of Legacy, but Stewart's conduct was excused. The jury found Stewart committed fraud against Cornwell and McKinney, his fraud was not excused, and McKinney was entitled to $9427.86 in out-of-pocket damages and $8000 in damages for loss of credit reputation.

In April 2018, the trial court entered a final judgment awarding the Scothorns $183,890.18, a sum the court arrived at by subtracting the damages awarded to McKinney, $17,427.86, from the damages awarded to the Scothorns, $201,318.04.

The judgment also awarded the Scothorns their costs against Cornwell and McKinney.

Cornwell and McKinney filed a motion for new trial asserting the jury's fraud and breach of fiduciary duty findings against Stewart negated or barred the finding of promissory estoppel against Cornwell and McKinney, the evidence was legally and factually insufficient to support the jury's findings , and the trial court erred in failing to award Cornwell and McKinney equitable relief and in awarding costs against Cornwell and McKinney. Cornwell and McKinney also filed a motion to modify the final judgment in which they argued, among other things, the Scothorns were not entitled to recover expenses of litigation, including postage, photocopies, and delivery services. The trial court granted Cornwell and McKinney's motion in part, reduced the costs awarded to the Scothorns by $184, and denied the motion in all other respects. This appeal followed.

In their first issue, Cornwell and McKinney argue the trial court erred by including the jury's promissory estoppel finding and associated damages against them when the jury's fraud and fiduciary duty findings against Stewart negate the finding of promissory estoppel against Cornwell and McKinney. In particular, Cornwell and McKinney argue the Scothorns "should not be allowed to benefit all the while participating in fraud against" Cornwell and McKinney. Cornwell and McKinney, in a single sentence, assert that "the same argument can be made regarding the finding that Appellee Stewart Scothorn breached his fiduciary duty."

–18–

In support of their assertions in their first issue, Cornwell and McKinney cite one case: *El Paso Healthcare System, Ltd. v. Piping Rock Corp.*, 939 S.W.2d 695 (Tex. App.—El Paso 1997, writ denied). In that case, El Paso Healthcare System (EPHS) sought to develop a medical office building and enlisted the help of Piping Rock, a developer. *Id.* at 697. The parties entered an agreement providing that Piping Rock would execute an agreement to purchase the land for the proposed building from EPHS and then contribute the land to the partnership as its capital contribution. *Id.* For its contribution, EPHS agreed to execute a Build and Lease Agreement under which it would lease all of the office space from the partnership upon completion of the building. *Id.* The agreement required Piping Rock to obtain and close a nonrecourse short-term construction loan no later than April 1, 1990. *Id.* at 698. The construction loan was to fund all costs of building construction. *Id.*

Piping Rock had the option to terminate the partnership without liability if the construction loan and the purchase of the land were not accomplished by April 1, 1990. *Id.* Piping Rock never obtained the construction loan, nor did it close the land purchase contract. *Id.* The parties nevertheless continued to work on the project together. Each party claims that the other induced it to continue. *Id.* at 699. EPHS presented evidence that it allowed Piping Rock to stay on the project because Piping Rock continually represented that it was close to closing a construction loan. *Id.* EPHS asserted that it agreed to temporarily fund construction costs after April 1, 1990, not because it wanted to induce Piping Rock to complete the project without

–19–

financing, but in reliance and anticipation on forthcoming financing. *Id.* Piping Rock presented evidence that after April 1, 1990, EPHS asked Piping Rock to continue with the construction even though there was no loan in place and agreed to fund the construction costs, including Piping Rock's costs, in order to complete the project. *Id.* Several Piping Rock requests to EPHS, dated after April 1, 1990, for payment of significant construction costs incurred, including Piping Rock's developer overhead, provided evidence that Piping Rock relied to its detriment on EPHS's promise to pay construction costs. *Id.*

Piping Rock filed suit against EPHS alleging, among other things, a promissory estoppel claim. *Id.* at 698. EPHS counterclaimed against Piping Rock for breach of the Agreement, fraudulent inducement, negligent misrepresentation, intentional interference with contract and breach of fiduciary duty. *Id.* The jury found that Piping Rock breached the Agreement and intentionally interfered with EPHS's contract to sell the medical office building but found no damages for EPHS on either cause of action. *Id.* The jury found for Piping Rock on its promissory estoppel claim and awarded $440,000 in damages for Piping Rock's developer overhead and $48,000 in costs for clearing a "staging area" next to the construction site. *Id.* The jury failed to find for either party on any other cause of action. *Id.*

On appeal, EPHS argued, among other things, that the doctrine of unclean hands barred Piping Rock from recovering on its promissory estoppel claim. *Id.* at 700. In making this argument, EPHS pointed to the jury's findings that Piping Rock

breached the original Agreement and that Piping Rock interfered with EPHS's contracts to sell the medical office building. *Id.* The court noted it was undisputed that Piping Rock failed to obtain financing as required in the Agreement. *Id.* The court then stated the following, which Cornwell and McKinney quote in their brief:

> A party may not predicate an estoppel in his favor on, or assert such estoppel for the purpose of making effective, obtaining the benefit of, or shielding himself from the results of his own fraud, and, similarly, he may not do so with respect to his own dereliction of duty, violation of law, wrongful act, or other inequitable conduct in the transaction in question.

*Id.* However, the court noted, Piping Rock was not seeking to enforce favorable provisions of the contract the jury found it had breached. *Id.* Instead, Piping Rock was seeking to enforce promises EPHS allegedly made outside the agreement. *Id.* The court had already found evidence in the record sufficient to determine that EPHS's promises were made to induce Piping Rock to remain on the project despite any breach. *Id.* The court determined that an equitable unclean hands defense could not be based on the very breach EPHS essentially excused by making the subject promises in order to keep Piping Rock on the job. *Id.* The court concluded that enforcing Piping Rock's equitable promissory estoppel claims in this context did not offend equity. *Id.*

Thus, *Piping Rock* addressed whether an unclean hands defense barred recovery on a promissory estoppel claim. *Piping Rock* does not stand for the proposition that Stewart's fraud in this case negated the Scothorns' promissory estoppel claims. *See id.* To the extent the jury found Stewart committed fraud and

damaged McKinney $9427.86 in out-of-pocket damages and $8000 in damages for loss of credit reputation, we cannot conclude this finding precluded the jury from also finding that the Scothorns were entitled to damages of $201,318.04 on their promissory estoppel claim against Cornwell and McKinney. *See id.* As to Cornwell and McKinney's argument that "the same argument can be made" regarding the jury's finding that Stewart breached his fiduciary duty, we note that the jury found Stewart's breach of fiduciary duty was excused, and Stewart breached a fiduciary duty owed to Legacy, not Cornwell and McKinney. We overrule Cornwell and McKinney's first issue.

In their second issue, Cornwell and McKinney argue the evidence is legally and factually insufficient to support the jury's answer to Question 16 regarding promissory estoppel. Specifically, Cornwell and McKinney argue there is no evidence that they "would provide a return to [the Scothorns] of the funds advanced, that the funds advanced would only be used for initial operations, or that Legacy would not incur debt."

In determining whether there is legally sufficient evidence to support the jury's decision, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005); *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 793 (Tex. App.—Dallas 2007, no pet.). To evaluate the factual sufficiency of the evidence supporting

–22–

the finding, we consider all the evidence and will set aside the verdict only if the evidence supporting the jury finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex. 1985); *Lamajak*, 230 S.W.3d at 793.

The elements of a promissory estoppel claim are (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial detrimental reliance by the promisee. *Trevino & Assocs. Mech., L.P. v. Frost Nat. Bank*, 400 S.W.3d 139, 146 (Tex. App.—Dallas 2013, no pet.); *see English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983); *Fretz Constr. Co. v. S. Nat'l Bank of Houston*, 626 S.W.2d 478, 480 (Tex. 1981). To show detrimental reliance, the plaintiff must demonstrate that he materially changed his position in reliance on the promise. *Trevino*, 400 S.W.3d at 146; *see English*, 660 S.W.2d at 524 (finding no promissory estoppel when plaintiff could not show he would not have taken his detrimental actions if defendant had not made promise).

Cornwell and McKinney assert, in part, that a "fourth element" of promissory estoppel must be proven: that injustice can be avoided only by enforcing the defendant's promise, citing *Collins v. Walker*, 341 S.W.3d 570, 573–74 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (elements of promissory estoppel are: (1) a promise, (2) foreseeability of reliance by the promisor, (3) substantial and

reasonable reliance by the promisee to its detriment, and (4) enforcing the promise is necessary to avoid injustice).

Question 16 of the jury charge asked, "Did the Scothorns substantially rely to their detriment on promise(s) made by any of those listed below, and was this reliance foreseeable by that person?" The jury answered "Yes" for both Cornwell and McKinney. Cornwell and McKinney did not object to the jury charge question on promissory estoppel. To preserve an appellate complaint premised on a defective jury charge, a party must "point out distinctly the objectionable matter and the grounds of the objection." TEX. R. CIV. P. 274. "Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." *Id.* If a party fails to lodge an objection to the jury charge that timely and plainly makes the trial court aware of the complaint, error is not preserved and the complaint is waived on appeal. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007); *see also* TEX. R. CIV. P. 278. Because Cornwell and McKinney failed to object to the jury charge question on promissory estoppel, their argument concerning a "fourth element" is waived. *See* TEX. R. CIV. P. 274.

Stewart testified Cornwell and McKinney discussed orders or business "in the tens of millions," a profit margin of thirty percent, and "Two and a half million dollars in revenue with $750,000 in profit for the first year." Cornwell and McKinney said they could start the business with $180,000 to get the necessary

equipment and secure the space. Once they got new business, there would be a down payment on the work, "so you have cash flow that automatically comes in." Regarding ownership, Stewart was to receive a twenty-percent interest for "that one $180,000." Stewart gave Cornwell and McKinney each a check for $15,000 in return for twenty-percent ownership and a return based on the "$750,000 in profit the first year, two and a half million dollars in sales." Stewart also gave Cornwell a $150,000 check to secure premises for the business and buy equipment. Stewart testified they "never talked about them having any kind of huge salary because there was no way that you could ever do the numbers to justify that." Stewart testified he did not agree that Cornwell and McKinney could each be paid $180,000 per year, and he did not agree on a specific amount for Cornwell's and McKinney's salaries.

Cornwell and McKinney provided Stewart a Branding Plan that memorialized in writing "some of the most significant things that we both agreed on and thought this would be important." The Plan discussed filling a "void in the current VIP aviation marketplace" for cabinetry and galleys by "starting our business debt-free and having long-term reoccurring business." The Plan contained a "three-year financial projection sales of two and a half million, net profit $750,000." The Plan stated, "we can meet our competitors [sic] prices if we want to because we will have less overhead and no debt."

Based on Cornwell and McKinney's promises, the Scothorns ultimately advanced more than $1.7 million in cash. Although the Scothorns never received

–25–

any money from Cornwell, McKinney, or Legacy, Cornwell and McKinney paid themselves $15,000 a month without telling the Scothorns. We conclude this evidence was legally and factually sufficient to support the jury's answer to Question 16 regarding promissory estoppel. *City of Keller*, 168 S.W.3d at 807; *Cain*, 709 S.W.2d at 176; *English*, 660 S.W.2d at 524. We overrule Cornwell and McKinney's second issue.

In their third issue, Cornwell and McKinney argue the evidence is insufficient to support the jury's affirmative answer to Question 19, which asked whether Stuart's breach of fiduciary duties owed to Legacy was excused. Question 19 also provided the following instruction:

> A party's conduct is excused if the other party is estopped from complaining about the unauthorized conduct. A party is estopped from complaining of the unauthorized conduct if when, with knowledge of the facts has [sic] so conducted himself as to lead the other party to believe that he would not have acted as he did.

Cornwell and McKinney argue "there is a lack of legal and factual sufficiency of the evidence with regards to question number 19 of the Charge of the Court." In support of this argument, Cornwell and McKinney argue courts have held that "[e]stoppel arises where, by the fault of one, another is induced to change his or her position for the worse," citing *Avary v. Bank of America, N.A.*, 72 S.W.3d 779, 788 (Tex. App.— Dallas 2002, no pet.). Cornwell and McKinney cite *Avary* in asserting the elements of an estoppel defense are (i) a false representation or concealment of material facts, (ii) made with knowledge, actual or constructive, of those facts, (iii) with the

–26–

intention that it should be acted on, (iv) to a party without knowledge or means of obtaining knowledge of the facts, (v) who detrimentally relies on the representations. *Id.* Cornwell and McKinney argue there is no evidence Stewart's conduct in which he failed to comply with his fiduciary duties changed his position for the worse based upon the actions of Cornwell and McKinney. Further, they argue the testimony shows there were numerous meetings between Stewart and Cornwell and McKinney, and all major decisions were made with Stewart's approval.

Thus, Cornwell and McKinney rely on the elements of an "estoppel defense" in making their arguments. However, as the Scothorns point out, Question 19 submitted the defense of quasi estoppel. Quasi-estoppel is a term applied to certain legal bars, such as ratification, election, acquiescence, or acceptance of benefits. *Forney 921 Lot Dev. Partners I, L.P. v. Paul Taylor Homes, Ltd.*, 349 S.W.3d 258, 268 (Tex. App.—Dallas 2011, pet. denied); *Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*, 817 S.W.2d 160, 164 (Tex. App.—Houston [14th Dist.] 1991, no writ). It is a long-standing doctrine applied to preclude contradictory positions: it precludes a person from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000); *see Schauer v. Von Schauer*, 138 S.W. 145, 149–50 (Tex. Civ. App.—Austin 1911, writ ref'd) ("Where a person has, with knowledge of the facts, acted or conducted himself in a particular manner, or asserted a particular claim, title, or right, he cannot afterwards assume a position inconsistent with such

act, claim or conduct to the prejudice of another."). The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced. *Lopez*, 22 S.W.3d at 864; *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App.—Corpus Christi-Edinburg 1994, writ denied); *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765–66 (Tex. App.—Texarkana 1992, writ denied). Unlike equitable estoppel, quasi-estoppel does not require a showing of a false representation or detrimental reliance. *Forney 921*, 349 S.W.3d at 268; *Steubner Realty 19, Ltd.*, 817 S.W.2d at 164.

Stewart testified that, from August 17, 2016, when he signed a document making him chief financial officer of Legacy until November 22 when he resigned, "the title of chief financial officer owed a fiduciary duty, but I did not have any of the documents or the ability to operate in that position given the information that I had." The document Stewart signed made him chief financial officer retroactively from the inception of the company. However, Stewart testified he "had no clue what was going on until we got [Lynch] involved." Stewart believed everything that Cornwell and McKinney said was true, and they continued to induce the Scothorns to put more money into Legacy.

Throughout 2016, Stewart met with Cornwell and McKinney once or twice a month, and Cornwell "would put up a spreadsheet" on cash flow, projects in progress, and costs. However, "there were no documents that were given."

Regarding profit margins, Stewart still understood "what they told me, which was everything was 30 percent."

Prior to October 2016, Stewart did not have access to Legacy's checking account. Stewart accessed Legacy's bank account and found "a number of charges that were questionable." Stewart did not know about "the $15,000 each [Cornwell and McKinney] took out a month" and only learned of the payments in discovery. Stewart also learned Cornwell and McKinney had a debit card that "they were charging all kinds of things" on, including "Pediatric dentists, $2,000 Kroger bills, $2,000 hotel bills, $800 dinners, all sorts of personal things."

Thus, although the record shows Stewart did not fulfill his fiduciary duties to Legacy, the record also shows that Cornwell and McKinney concealed financial information from Stewart and made false representations concerning Legacy's fiscal condition that Stewart relied on to his detriment. Stewart and Diana invested a total of $1,793,102 in Legacy, and they did not receive any return on their investment in Legacy. Thus, even accepting Cornwell and McKinney's framing of the issue, there was sufficient evidence establishing that estoppel excused Stewart's breach of his fiduciary duty to Legacy. *See Avary*, 72 S.W.3d at 788. More to the point, the evidence was legally and factually sufficient to support the jury's answer to Question 19 on the basis of quasi estoppel. *See City of Keller*, 168 S.W.3d at 807; *Cain*, 709 S.W.2d at 176; *Forney 921*, 349 S.W.3d at 268; *Steubner Realty 19, Ltd.*, 817 S.W.2d at 164. We overrule Cornwell and McKinney's third issue.

–29–

In their fourth issue, Cornwell and McKinney argue the trial court erred in not awarding them equitable relief based on the jury's finding Stewart breached his fiduciary duty. A trial court's decision regarding equitable relief is reviewed under an abuse of discretion standard and may only be overturned if the decision was arbitrary or unreasonable. *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 742 (Tex. 2018). Specifically, Cornwell and McKinney argue the Scothorns "emptied Legacy's bank account in the amount of $47,000," and they should have been awarded this amount as equitable relief. Cornwell and McKinney ignore the fact that the jury found Stewart did not fulfill his fiduciary duty to Legacy, not to them, and the jury correctly found Stewart's breach of fiduciary duty was excused. Under these circumstances, we cannot conclude the trial court abused its discretion in not awarding Cornwell and McKinney $47,000 in equitable relief. We overrule Cornwell and McKinney's fourth issue.

In their fifth issue, Cornwell and McKinney argue the evidence is legally and factually insufficient to support the jury's answer to Question 8, which asked whether they committed fraud against the Scothorns. Again, Cornwell and McKinney ignore the fact that the jury also found their fraud was excused. Further, the trial court's judgment does not refer to the jury's finding that Cornwell and McKinney committed fraud or make any award based on the finding of fraud.

A trial court may disregard a jury finding only if it is unsupported by evidence, a condition not met in this case, or if the issue is immaterial. *Spencer v. Eagle Star*

–30–

*Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994) (citing *C. & R. Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966)). A question is immaterial when it should not have been submitted, or when it was properly submitted but has been rendered immaterial by other findings. *Id.*; *Chambers v. Equity Bank, SSB*, 319 S.W.3d 892, 902 n.15 (Tex. App.—Texarkana 2010, no pet.) (where questions disregarded by trial court were rendered immaterial by jury's other finding, court would not address sufficiency of evidence in support of jury's answers to those questions). Here, the jury's finding that Cornwell and McKinney committed fraud was rendered immaterial by the jury's finding that the fraud was excused, and the trial court properly disregarded the finding of fraud and did not incorporate that finding into the final judgment. *See Spencer*, 876 S.W.2d at 157. Accordingly, we need not address the sufficiency of the evidence to support the finding of fraud. *See Chambers*, 319 S.W.3d 892, 902 n.15. We overrule Cornwell and McKinney's fifth issue.

In their sixth issue, Cornwell and McKinney argue the trial court erred in awarding costs against them. As a general rule, the successful party to a suit shall recover of his adversary all costs incurred therein. TEX. R. CIV. P. 131. A successful party is one who gets a judgment from a competent court vindicating a civil claim of right. *Hasty Inc. v. Inwood Buckhorn Joint Venture*, 908 S.W.2d 494, 502 (Tex. App.—Dallas 1995, writ denied). The allocation of costs is a matter for the trial court's discretion and cannot be overturned on appeal, absent an abuse of discretion.

*Nolte v. Flournoy*, 348 S.W.3d 262, 270 (Tex. App.—Texarkana 2011); *Madison v. Williamson*; 241 S.W.3d 145, 157 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

In making their argument, Cornwell and McKinney renew their argument that the breach of fiduciary duty finding against Stewart negated the finding against them for promissory estoppel and point out that they prevailed in a summary judgment proceeding prior to trial. We have already rejected the argument that Stewart's breach of fiduciary duty negated the promissory estoppel finding against Cornwell and Scothorn. Further, in this proceeding, the jury found the Scothorns' damages were $201,318.04, McKinney was entitled to $9427.86 in out-of-pocket damages and $8000 in damages for loss of credit reputation, and the trial court entered a final judgment awarding the Scothorns $183,890.18. Under these circumstances, we conclude the trial court did not abuse its discretion in awarding the Scothorns their costs. *See Nolte*, 348 S.W.3d at 270; *Madison*; 241 S.W.3d at 157. We overrule Cornwell and McKinney's sixth issue.

In their seventh issue, Cornwell and McKinney argue the trial court erred in awarding the amount of costs submitted in the Scothorns' amended bill of cost. Specifically, Cornwell and McKinney argue $773.50 for legal document services was an expense of litigation that was not recoverable. At oral argument, counsel for the Scothorns agreed to the $773.50 reduction in costs. Accordingly, we sustain Cornwell and McKinney's seventh issue.

–32–

In their eighth issue, Cornwell and McKinney argue the evidence conclusively establishes the jury's award of damages is excessive. In support of this issue, Cornwell and McKinney submit a single sentence: "Based upon the arguments above, the jury's award of $201,318.04 against Appellants is excessive based on the evidence presented at trial." An appellant's failure to cite legal authority or provide substantive analysis of a legal issue results in waiver of the complaint. *Fredonia State Bank v. General Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994). Accordingly, we need not further address Cornwell and McKinney's eighth issue.

In their ninth issue, Cornwell and McKinney argue the trial court erred in denying their motion for new trial. Again, aside from citing authority for the propositions that (1) "denying a motion for new trial is appealable" and (2) the standard of review is abuse of discretion, Cornwell and McKinney fail to provide any substantive analysis of the issue other than the assertion that the trial court erred "for the reasons set forth in the above sections." We conclude Cornwell and McKinney have also waived this complaint. *See id.* We need not further address Cornwell and McKinney's ninth issue.

We reform the trial court's judgment to delete the award of $773.50 in costs to the Scothorns. As modified, we affirm the trial court's judgment.

/Robert D. Burns, III/
ROBERT D. BURNS, III
CHIEF JUSTICE

180799F.P05

–33–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JONATHAN CORNWELL AND
SHADD MCKINNEY, Appellants

No. 05-18-00799-CV      V.

DIANA SCOTHORN, STEWART
SCOTHORN, THE BENEFIT LINK,
INC., AND SCOTHORN AERO,
INC., Appellees

On Appeal from the 429th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 429-05287-
2016.
Opinion delivered by Chief Justice
Burns. Justices Molberg and Partida-
Kipness participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

the award of $773.50 in costs to Diana Scothorn and Stewart Scothorn is deleted.

It is **ORDERED** that, as modified, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees Diana Scothorn, Stewart Scothorn, The Benefit Link, Inc., and Scothorn Aero, Inc. recover their costs of this appeal from appellants Jonathan Cornwell and Shadd McKinney.

Judgment entered this 17th day of September 2020.